Rachel L. Sykes (#11778)
**PEARSON | BUTLER**
1802 South Jordan Parkway, Suite 200
South Jordan, Utah 84095
Tel: (801) 981-4438
Email: rachel@pearsonbutler.com
*Attorney for Plaintiff*

<u>**IN THE UNITED STATES DISTRICT COURT**</u>
<u>**FOR THE DISTRICT OF UTAH**</u>

| | |
|---|---|
| **RICHARD GUZMAN**, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> **PROG LEASING, LLC d/b/a PROGRESSIVE LEASING,** <br><br> Defendant. | **COMPLAINT** <br><br> **JURY DEMANDED** <br><br><br><br> Case No: 2:23-cv-00813-CMR <br> Assigned Judge: <br> Assigned Magistrate: Cecilia M. Romero |

<u>**CLASS ACTION COMPLAINT**</u>

Plaintiff Richard Guzman, on behalf of himself and all others similarly situated, bring this

Class Action Complaint ("Complaint") against Defendant Prog Leasing, LLC d/b/a Progressive

Leasing ("Progressive Leasing" or "Defendant") and alleges, upon personal knowledge as to their

own actions and their counsel's investigation, and upon information and belief as to all other

matters, as follows:

## NATURE OF THE CASE

1.    Plaintiff brings this class action against Progressive Leasing for its failure to properly secure and safeguard personally identifiable information ("PII" or "Private Information") of Plaintiff's and other similarly situated customers (collectively, the "Class Members") from hackers. Defendant failed to provide timely, adequate, and accurate notice that the integrity of their PII had been compromised and stolen. Plaintiff's and Class Members' compromised PII included their first and last names, addresses, phone numbers, Social Security numbers, date of birth, bank account numbers, monthly gross income, credit limit, and email addresses belonging to roughly 193,000 Class Members.[1]

2.    Founded in 1999, Progressive Leasing provides "alternative lease-purchase options to consumers with less than perfect credit."[2] Defendant leases merchandise for personal, family, and household use, including appliances, furniture, jewelry, electronics, mattresses, mobile devices and accessories, and musical instruments. Defendant's lease-to-own programs are offered through various companies around the country that allow customers to enter into lease programs to pay for products over time. To apply for Defendant's lease programs, customers must provide PII, including their Social Security number, bank account details, and credit or debit card information.

3.    Upon information and belief, individuals, including Plaintiff and Class Members who wished to receive leasing services from Defendant were required to entrust Defendant with sensitive, non-public PII, without which Defendant could not perform its regular business

---

[1] https://apps.web.maine.gov/online/aeviewer/ME/40/84f4c920-079d-4928-896e-977e2bd8ac35.shtml (last accessed Nov. 1, 2023)
[2] https://progleasing.com/about-us/ (last accessed Nov. 1, 2023)

activities, in order to obtain services from Defendant, including entering into a lease agreement with Defendant. Defendant retains this information for at least many years and even after the customer relationship has ended.

4.     By obtaining, collecting, using, and deriving a benefit from the PII of Plaintiff and Class members, Defendant assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion.

5.     On or around September 9, 2023, Progressive Leasing experienced a cybersecurity incident, during which an unauthorized third party gained access to its network and to certain files containing personal information of some customers and employees (the "Data Breach").[3]

6.     Defendant discovered the breach on September 11, 2023, after which it hired cybersecurity experts and launched an investigation. Defendant learned that the Data Breach affected the Personal Information of 193,055, including their names, addresses, phone numbers, Social Security numbers, date of birth, bank account numbers, monthly gross income, credit limit and email addresses.

7.     Despite the breadth and sensitivity of the PII exposed, and the attendant consequences to Plaintiff and Class Members as a result of the exposure, Progressive Leasing failed to disclose the Data Breach for over a month from the time the Data Breach occurred, further exacerbating harm to Plaintiff and the Class.

---

[3] https://apps.web.maine.gov/online/aeviewer/ME/40/84f4c920-079d-4928-896e-977e2bd8ac35/9361b0be-31f7-4b30-941e-c3d616c0dfb0/document.html (last accessed Nov. 1, 2023).

8.      This Data Breach was a direct result of Progressive Leasing's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect Plaintiff's and Class Members' PII.

9.      Progressive Leasing disregarded the rights of Plaintiff and Class Members by: intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard Plaintiff's and Class Members' PII; failing to take standard and reasonably available steps to prevent the Data Breach; failing to monitor and timely detect the Data Breach; failing to provide Plaintiff and Class Members prompt and accurate notice of the Data Breach; and failing to provide comprehensive and effective credit protection services after notification of the Data Breach.

10.     As a result of Progressive Leasing's failure to implement and follow basic security procedures, the PII of employees, as well as customers, of Progressive Leasing is now in the hands of thieves who, upon information and belief, have committed criminal acts against Plaintiff and the Class by misusing their data and/or have published and/or sold their data on the internet (i.e., the "dark web") for others to view, access, and/or misuse. Plaintiff and Class Members have had to spend, and will continue to spend, significant amounts of time and money to protect themselves from the adverse ramifications of the Data Breach and will forever be at a heightened risk of identity theft and financial fraud.

11.     There has been no assurance offered by Progressive Leasing that all personal data or copies of data have been recovered or destroyed, or that it has adequately enhanced its data security practices sufficient to avoid a similar breach of its network in the future.

12.     Therefore, Plaintiff and Class Members are at an imminent, immediate, and continuing increased risk of suffering ascertainable losses in the form of identity theft and other fraudulent misuse of their Private Information, out-of-pocket expenses incurred to remedy or mitigate the effects of the Data Breach, and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

13.     Plaintiff brings this action to address Defendant's inadequate safeguarding of his and Class Members' PII that it collected and maintained, and its failure to provide timely and adequate notice to Plaintiff and Class Members of the types of information accessed, and that such information was subject to unauthorized access by cybercriminals.

14.     Plaintiff seeks to remedy these harms on behalf of himself and all others similarly situated whose PII was accessed and/or compromised by the Data Breach.

15.     Accordingly, Plaintiff, on behalf of himself and the Class, asserts claims for negligence, invasion of privacy, breach of implied contract, unjust enrichment, and declaratory/injunctive relief.

## **PARTIES**

16.      Plaintiff Richard Guzman is an individual citizen of Brownsville, Texas. Mr. Guzman intends to remain in Texas indefinitely.

17.     Defendant is a limited liability company headquartered with its principal place of business located at 256 W. Data Drive, Draper, UT 84020.

18.     The true names and capacities of persons or entities, whether individual, corporate, associate, or otherwise, who may be responsible for some of the claims alleged herein are currently

unknown to Plaintiff.  Plaintiff will seek leave of court to amend this complaint to reflect the true names and capacities of such other responsible parties when their identities become known.

19.    All of Plaintiff's claims stated herein are asserted against Defendant and any of its owners, predecessors, successors, subsidiaries, agents and/or assigns.

## JURISDICTION AND VENUE

20.    The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of class members is over 100, many of whom have different citizenship from Progressive Leasing. Thus, minimal diversity exists under 28. U.S.C. § 1332(d)(2)(A).

21.    This Court has jurisdiction over Progressive Leasing because Progressive Leasing's headquarters and principal place of business is located within this District and the Defendant conducts substantial business in this district.

22.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to these claims occurred in, were directed to, and/or emanated from this District, and Defendant resides within this judicial district.

## FACTUAL ALLEGATIONS

**A. Defendant's Business and Collection of Plaintiff's and Class Members' Private Information**

23.    Defendant requires its employees and customers to entrust it with highly sensitive Personal Information, including Social Security numbers, bank account details, and credit or debit card information. As alleged above, Defendant provides lease-to-own programs through various

companies throughout the country pursuant to which customers can enter into lease programs to pay for personal, family, and household products over time.

24.    Plaintiff and Class members are current and former customers or employees of Defendant.

25.    Recognizing the high sensitivity and private nature of the PII Progressive Leasing acquires and stores with respect to its customers and employees, Progressive Leasing, upon information and belief, promises to: keep Private Information private; comply with industry standards related to data security and the maintenance of its current and former employees' and customers' Private Information; inform them of its legal duties relating to data security and compliance with all federal and state laws protecting customer and employee Private Information; only use and release customers' and employees' Private Information for reasons that relate to the services it provides; not store former customer or employee Private Information for longer than is necessary to carry out its business operations; and provide adequate notice to its current and former employees and customers if their Private Information is disclosed without authorization.

26.    By obtaining, collecting, using, and deriving a benefit from the Class Members Private Information, Progressive Leasing assumed legal and equitable duties and knew or should have known that it was responsible for protecting the Private Information from unauthorized disclosure and exfiltration.

27.    The information held by Defendant in its computer systems at the time of the Data Breach included the unencrypted PII of Plaintiff and Class members.

28.     Plaintiff and Class members relied on Progressive Leasing to keep their Private Information confidential and securely maintained and to only make authorized disclosures of this Private Information, which Defendant ultimately failed to do.

**B.  The Data Breach and Defendant's Inadequate Notice to Plaintiff and Class Members**

29.     Progressive Leasing notified all impacted current and former Progressive Leasing employees and customers on or around October 23, 2023 (the "Notice"). Defendant reported that the Data Breach occurred over a month earlier, on September 9, 2023, and that it did not learn of the Data Breach until September 11, 2023. Progressive Leasing's investigation of the Data Breach revealed that an "unauthorized party" gained access to its systems, which allowed it to access copies of Plaintiff's and Class Members' Private Information.

30.     Omitted from the Notice are the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiff and Class members, who retain a vested interest in ensuring that their PII remains protected.

31.     This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiff and Class members of the Data Breach's critical facts. Without these details, Plaintiff's and Class members' ability to mitigate the harms resulting from the Data Breach is severely limited.

32.     It is clear, in light of the fraudulent misuse of the stolen Private Information that has already occurred, that the data thieves carried out the Data Breach in order to either use the Private Information themselves for nefarious purposes, or to sell it on the dark web for financial gain.

33.     Thus, through the Data Breach, the unauthorized cybercriminals accessed and exfiltrated a cache of highly sensitive Private Information, including Progressive Leasing current and former employees' and customers' names, addresses, phone numbers, Social Security numbers, date of birth, bank account numbers, monthly gross income, credit limit and email addresses.

34.     Progressive Leasing had obligations created by contract, industry standards, and common law to keep Plaintiff's and Class Members' Private Information confidential and protected from unauthorized access and disclosure.

35.     Plaintiff and Class Members provided their Private Information to Progressive Leasing with the reasonable expectation and mutual understanding that Progressive Leasing would comply with its obligations to keep such Private Information confidential and secure from unauthorized access and disclosure, and to provide timely notice of any security breaches.

36.     Defendant's data security obligations were particularly important given the substantial increase in cyberattacks carried out against employers and companies in recent years.

37.     Progressive Leasing knew or should have known that its electronic records would be targeted by cybercriminals, yet it failed to take the necessary precautions to protect Plaintiff's and Class Members' Private Information from being compromised.

38.     In response to its admitted failure to safeguard Plaintiff's and Class Members' Private Information, Defendant's purported remedy is woefully inadequate. Despite many years of future risk and exposure, Defendant's Notice only offered 12 months of credit monitoring, which is plainly insufficient under the circumstances.

### C. Progressive Leasing Failed to Comply with FTC Guidelines

39.    Progressive Leasing was prohibited by the Federal Trade Commission Act (the "FTC Act") (15 U.S.C. § 45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission (the "FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

40.    The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

41.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[4] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[5]

---

[4] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Jan. 19, 2022).
[5] *Id.*

42.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

43.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

44.     Progressive Leasing failed to properly implement basic data security practices.

45.     Progressive Leasing failure to employ reasonable and appropriate measures to protect against unauthorized access to customers' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

46.     Progressive Leasing was at all times fully aware of the obligation to protect the PII of employees and customers. Progressive Leasing was also aware of the significant repercussions that would result from its failure to do so.

**D. Progressive Leasing Failed to Comply with Industry Standards**

47.     As shown above, experts studying cyber security routinely identify financial companies as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

48.    Several best practices have been identified that at a minimum should be implemented by financial companies like Progressive Leasing, including but not limited to educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

49.    Other best cybersecurity practices that are standard in the financial industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

50.    Progressive Leasing failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

51.    These foregoing frameworks are existing and applicable industry standards in the financial industry, and Progressive Leasing failed to comply with these accepted standards, thereby opening the door to the cyber incident and causing the Data Breach.

**E. Progressive Leasing Breached its Duty to Safeguard Plaintiff's and Class Members' PII**

52.    In addition to its obligations under federal and state laws, Progressive Leasing owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing,

safeguarding, deleting, and protecting the PII/PHI in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Progressive Leasing owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the PII of Class Members.

53.     Progressive Leasing owed a duty to Plaintiff and Class Members to create and implement reasonable data security practices and procedures to protect the PII in its possession, including adequately training its employees and others who accessed PII within its computer systems on how to adequately protect PII.

54.     Progressive Leasing owed a duty to Plaintiff and Class Members to implement processes that would detect a compromise of PII in a timely manner.

55.     Progressive Leasing owed a duty to Plaintiff and Class Members to act upon data security warnings and alerts in a timely fashion.

56.     Progressive Leasing owed a duty to Plaintiff and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred.

57.     Progressive Leasing owed a duty of care to Plaintiff and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

58.     Progressive Leasing owes a legal duty to secure consumers' PII and PHI and to timely notify consumers of a data breach.

59.     Progressive Leasing breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its

computer systems and data. Progressive Leasing unlawful conduct includes, but is not limited to, the following acts and/or omissions:

    a. Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

    b. Failing to adequately protect customers' PII;

    c. Failing to properly monitor its own data security systems for existing intrusions;

    d. Failing to ensure that its vendors with access to its computer systems and data employed reasonable security procedures;

    e. Failing to detect unauthorized ingress into its systems;

    f. Failing to implement and monitor reasonable network segmentation to detect unauthorized travel within its systems, including to and from areas containing the most sensitive data;

    g. Failing to detect unauthorized exfiltration of the most sensitive data on its systems;

    h. Failing to train its employees in the proper handling of emails containing PII and maintain adequate email security practices;

    i. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1)(i);

    j. Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

    k. Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act;

    l. Failing to adhere to industry standards for cybersecurity as discussed above; and

    m. Otherwise breaching its duties and obligations to protect Plaintiff's and Class Members' Private Information.

60.    Progressive Leasing negligently and unlawfully failed to safeguard Plaintiff's and Class Members' PII by allowing cyberthieves to access its computer network and systems which contained unsecured and unencrypted PII.

61.    Had Progressive Leasing remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, Progressive Leasing could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiff's and Class Members' confidential PII.

62.     However, due to Defendant's failures, Plaintiff and Class Members now face an increased risk of fraud and identity theft. In addition, Plaintiff and the Class Members also lost the benefit of the bargain they made with Progressive Leasing.

**F.   Progressive Leasing Knew or Should Have Known that Criminals Target PII**

63.     Progressive Leasing's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in the financial industry and other industries holding significant amounts of PII preceding the date of the breach.

64.     At all relevant times, Progressive Leasing knew, or should have known, its former and current employees', customers', Plaintiff's, and all other Class Members' PII was a target for malicious actors. Despite such knowledge, Progressive Leasing failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class Members' PII from cyber-attacks that Progressive Leasing should have anticipated and guarded against.

65.     The targeted attack was expressly designed to gain access to and exfiltrate private and confidential data, including (among other things) the PII of Plaintiff and Class Members.

66.     PII is a valuable property right.[6] The value of PII as a commodity is measurable.[7] "Firms are now able to attain significant market valuations by employing business models

---

[6] *See* Marc van Lieshout, *The Value of Personal Data*, 457 IFIP ADVANCES IN INFORMATION AND COMMUNICATION TECHNOLOGY 26 (May 2015), https://www.researchgate.net/publication/283668023_ The_Value_of_Personal_Data ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible...").
[7] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (Apr. 28, 2014), http://www.medscape.com/viewarticle/824192.

predicated on the successful use of personal data within the existing legal and regulatory frameworks."[8] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[9] Private Information is so valuable to identity thieves that once Private Information has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

67.     As a result of its real value and the recent large-scale data breaches, identity thieves and cyber criminals have openly posted credit card numbers, SSNs, PII, and other sensitive information directly on various Internet websites, making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be aggregated and become more valuable to thieves and more damaging to victims.

68.     According to an FBI publication, "[r]ansomware is a type of malicious software, or malware, that prevents you from accessing your computer files, systems, or networks and demands you pay a ransom for their return. Ransomware attacks can cause costly disruptions to operations and the loss of critical information and data."  This publication also explains that "[t]he FBI does not support paying a ransom in response to a ransomware attack. Paying a ransom doesn't guarantee you or your organization will get any data back. It also encourages perpetrators to target more victims and offers an incentive for others to get involved in this type of illegal activity."[10]

---

[8] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD 4 (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[9] *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, Interactive Advertising Bureau (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

[10] https://www.fbi.gov/how-we-can-help-you/safety-resources/scams-and-safety/common-scams-and-crimes/ransomware (last accessed November 29, 2022).

69.    Consumers place a high value on the privacy of that data. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[11]

70.    Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

71.    Indeed, cyberattacks against the financial industry have been common for over ten years with the Federal Bureau of Investigation ("FBI") warning as early as 2011 that cybercriminals were "advancing their abilities to attack a system remotely" and "[o]nce a system is compromised, cyber criminals will use their accesses to obtain PII." The FBI further warned that that "the increasing sophistication of cyber criminals will no doubt lead to an escalation in cybercrime."[12]

72.    Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to

---

[11] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) INFORMATION SYSTEMS RESEARCH 254 (June 2011), https://www.jstor.org/stable/23015560?seq=1.
[12] Gordon M. Snow, *Statement before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit*, FBI (Sept. 14, 2011), https://archives.fbi.gov/archives/news/testimony/cyber-security-threats-to-the-financial-sector.

17

ransomware criminals… because they often have lesser IT defenses and a high incentive to regain access to their data quickly.[13]

73.    Progressive Leasing should have known about its data security vulnerabilities and implemented enhanced and adequate protection, particularly given the nature of the PII stored in its unprotected files.

### G. Cyberattacks and Data Breaches Cause Disruption and Put Consumers at an Increased Risk of Fraud and Identity Theft

74.    Cyberattacks and data breach at financial companies like Progressive Leasing are especially problematic because they can negatively impact the overall daily lives of individuals affected by the attack.

75.    The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[14]

76.    That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal personally identifiable information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims, take over victims' identities in order to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person,

---

[13] *FBI, Secret Service Warn of Targeted*, Law360 (Nov. 18, 2019), https://www.law360. arn-of-targeted-ransomware (last visited July 2, 2021).
[14] *See* U.S. Gov. Accounting Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (2007). Available at https://www.gao.gov/new.items/d07737.pdf.

the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

77.    Theft of PII is serious. The FTC warns consumers that identity thieves use Private Information to exhaust financial accounts, start new utility accounts, and incur charges and credit in a person's name.

78.    The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (and consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[15]

79.    Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud. According to Experian, one of the largest credit reporting companies in the world, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they

---

[15] *See IdentityTheft.gov*, Federal Trade Commission, https://www.identitytheft.gov/Steps (last visited Jan. 19, 2022).

will use it" to among other things: open a new credit card or loan, change a billing address so the victim no longer receives bills, open new utilities, obtain a mobile phone, open a bank account and write bad checks, use a debit card number to withdraw funds, obtain a new driver's license or ID, and/or use the victim's information in the event of arrest or court action.

80.     Identity thieves can also use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, and/or rent a house or receive medical services in the victim's name.

81.     Moreover, theft of PII is also gravely serious because Private Information is an extremely valuable property right.[16]

82.     Each year, identity theft causes tens of billions of dollars of losses to victims in the United States. For example, with the PII stolen in the Data Breach, which includes Social Security numbers, identity thieves can open financial accounts, commit medical fraud, apply for credit, file fraudulent tax returns, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants, steal government benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft. These criminal activities have and will result in devastating financial and personal losses to Plaintiff and Class Members.

---

[16] *See, e.g.,* John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

83.     PII is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

84.     There is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

85.     For example, it is believed that certain highly sensitive personal information compromised in the 2017 Experian data breach was being used, three years later, by identity thieves to apply for COVID-19-related unemployment benefits.

86.     Cybercriminals may not use the information right away. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[17]

87.     Social Security numbers are particularly sensitive pieces of personal information. As the Consumer Federation of America explains:

> **Social Security number**: *This is the most dangerous type of personal information in the hands of identity thieves* because it can open the gate to serious fraud, from obtaining credit in your name to impersonating you to get medical services, government benefits, your tax refund, employment—even using your identity in bankruptcy and other legal matters. It's hard to change your Social

---

[17] *Data Breaches are Frequent*, *supra* note 11.

Security number and it's not a good idea because it is connected to
your life in so many ways.[18]

88.    For instance, with a stolen Social Security number, which is only one subset of the
Private Information compromised in the Data Breach, someone can open financial accounts, get
medical care, file fraudulent tax returns, commit crimes, and steal benefits.[19]

89.    The Social Security Administration has warned that identity thieves can use an
individual's Social Security number to apply for additional credit lines.[20] Such fraud may go
undetected until debt collection calls commence months, or even years, later. Stolen Social
Security Numbers also make it possible for thieves to file fraudulent tax returns, file for
unemployment benefits, or apply for a job using a false identity.[21] Each of these fraudulent
activities is difficult to detect. An individual may not know that his or her Social Security Number
was used to file for unemployment benefits until law enforcement notifies the individual's
employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an
individual's authentic tax return is rejected.

90.    An individual cannot obtain a new Social Security number without significant
paperwork and evidence of actual misuse. Even then, a new Social Security number may not be
effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the

---

[18] *See, e.g.*, Christine DiGangi, *5 Ways an Identity Thief Can Use Your Social Security Number*,
Nov. 2, 2017, https://blog.credit.com/2017/11/5-things-an-identity-thief-can-do-with-your-social-
security-number-108597/ (emphasis added).
[19] *Id*.
[20] *Identity Theft and Your Social Security Number*, Social Security Administration (2018) at 1.
Available at https://www.ssa.gov/pubs/EN-05-10064.pdf (Jan. 19, 2022).
[21] *Id*. at 4

old number, so all of that old bad information is quickly inherited into the new Social Security number."[22]

91.    This was a financially motivated Data Breach, as the only reason the cybercriminals go through the trouble of running a targeted cyberattack against companies like Progressive Leasing is to get information that they can monetize by selling on the black market for use in the kinds of criminal activity described herein. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."

92.    Indeed, a social security number, date of birth, and full name can sell for $60 to $80 on the digital black market.[23] "[I]f there is reason to believe that your personal information has been stolen, you should assume that it can end up for sale on the dark web."[24]

93.    These risks are both certainly impending and substantial. As the FTC has reported, if hackers get access to PII, they *will use it*.[25]

---

[22] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.
[23] Michael Kan, *Here's How Much Your Identity Goes for on the Dark Web*, Nov. 15, 2017, https://www.pcmag.com/news/heres-how-much-your-identity-goes-for-on-the-dark-web.
[24] *Dark Web Monitoring: What You Should Know*, Consumer Federation of America, Mar. 19, 2019, https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/.
[25] *Id*.

94.    Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that most victims of identity crimes need more than a month to resolve issues stemming from identity theft and some need over a year.[26]

95.    Theft of SSNs also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number, a breach victim has to demonstrate ongoing harm from misuse of her SSN, and a new SSN will not be provided until after the victim has suffered the harm.

96.    Due to the highly sensitive nature of SSNs, theft of SSNs in combination with other PII (e.g., name, address, date of birth) is akin to having a master key to the gates of fraudulent activity. TIME quotes data security researcher Tom Stickley, who is employed by companies to find flaws in their computer systems, as stating, "If I have your name and your Social Security number and you haven't gotten a credit freeze yet, you're easy pickings."[27]

97.    Cybercriminals can post stolen PII on the cyber black-market for years following a data breach, thereby making such information publicly available.

98.    Approximately 21% of victims do not realize their identify has been compromised until more than two years after it has happened.[28] This gives thieves ample time to seek multiple treatments under the victim's name. Forty percent of consumers found out they were a victim of

---

[26] *2021 Consumer Aftermath Report: How Identity Crimes Impact Victims, their Families, Friends, and Workplaces*, IDENTITY THEFT RESOURCE CENTER (2021), https://www.idtheftcenter.org/identity-theft-aftermath-study/ (last visited Aug. 2, 2022).

[27] Patrick Lucas Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME (Aug. 5, 2019, 3:39 PM), https://time.com/5643643/capital-one-equifax-data-breach-social-security/

[28] *See* Medical ID Theft Checklist, *available at:* https://www.identityforce.com/blog/medical-id-theft-checklist-2.

24

medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.[29]

99.    Identity theft victims must spend countless hours and large amounts of money repairing the impact to their credit as well as protecting themselves in the future.[30]

100.    It is within this context that Plaintiff and all other Class Members must now live with the knowledge that their PII is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

101.    A study by the Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information.

---

[29] Experian, *The Potential Damages and Consequences of Medical Identify Theft and Healthcare Data Breaches ("Potential Damages"), available at:* https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf.

[30] "Guide for Assisting Identity Theft Victims," Federal Trade Commission, 4 (Sept. 2013), http://www.consumer.ftc.gov/articles/pdf-0119-guide-assisting-id-theft-victims.pdf.

Americans' expenses/disruptions as a result of criminal activity in their name [2016]

| | |
|---|---|
| I had to request government assistance | 29.5% |
| I had to borrow money | 60.7% |
| Had to use my savings to pay for expenses | 32.8% |
| Couldn't qualify for a home loan | 32.8% |
| I lost my home/place of residence | 31.1% |
| I couldn't care for my family | 34.4% |
| Had to rely on family/friends for assistance | 49.2% |
| Lost out on an employment opportunity | 44.3% |
| Lost time away from school | 19.7% |
| Missed time away from work | 55.7% |
| Was generally inconvenienced | 73.8% |
| Other | 23% |
| None of these | 3.3% |

Source: Identity Theft Resource Center    creditcards·com

102.    Victims of the Data Breach, like Plaintiff and Class Members, must spend many hours and large amounts of money protecting themselves from the current and future negative impacts to their privacy and credit because of the Data Breach.[31]

103.    As a direct and proximate result of the Data Breach, Plaintiff and Class Members have had their PII exposed, have suffered harm as a result, and have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft.  Plaintiff and Class Members must now take the time and effort (and spend the money) to mitigate the actual and potential impact of the Data Breach on their everyday lives, including purchasing identity theft

---

[31] "Guide for Assisting Identity Theft Victims," Federal Trade Commission, 4 (Sept. 2013), http://www.consumer.ftc.gov/articles/pdf-0119-guide-assisting-id-theft-victims.pdf.

and credit monitoring services every year for the rest of their lives, placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions and healthcare providers, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts, credit reports, and health insurance account information for unauthorized activity for years to come.

104.    Plaintiff and Class Members have suffered or will suffer actual harms for which they are entitled to compensation, including but not limited to the following:

    a.   Actual identity theft, including fraudulent credit inquiries and cards being opened in their names;

    b.   Trespass, damage to, and theft of their personal property, including PII;

    c.   Improper disclosure of their PII;

    d.   The imminent and certainly impending injury flowing from actual and potential future fraud and identity theft posed by their PII being in the hands of criminals and having already been misused;

    e.   The imminent and certainly impending risk of having their confidential Private Information used against them by spam callers to defraud them;

    f.   Damages flowing from Defendant's untimely (and in some cases, non-existent) and inadequate notification of the Data Breach;

    g.   Loss of privacy suffered as a result of the Data Breach;

    h.   Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably expended to remedy or mitigate the effects of the Data Breach;

i.    Ascertainable losses in the form of deprivation of the value of Plaintiff's and Class Members' Private Information for which there is a well-established and quantifiable national and international market;

j.    The loss of use of and access to their credit, accounts, and/or funds;

k.    Damage to their credit due to fraudulent use of their PII; and

l.    Increased cost of borrowing, insurance, deposits, and other items which are adversely affected by a reduced credit score.

105.    Moreover, Plaintiff and Class Members have an interest in ensuring that their PII, which remains in the possession of Progressive Leasing, is protected from further public disclosure by the implementation of better employee training and industry standard and statutorily compliant security measures and safeguards. Progressive Leasing has shown itself to be wholly incapable of protecting Plaintiff's and Class Members' PII.

106.    Plaintiff and Class Members also have an interest in ensuring that their personal information that was provided to Progressive Leasing is removed from Defendant's unencrypted files.

107.    Progressive Leasing itself acknowledged the harm caused by the Data Breach because it offered Plaintiff and Class Members the inadequate 12 months of identity theft protection and credit monitoring services. This limited identity theft monitoring is, however, inadequate to protect Plaintiff and Class Members from a lifetime of identity theft risk.

108.    Progressive Leasing further acknowledged, in its letter to Plaintiff and other Class Members, that, in response to the Data Breach, Progressive Leasing "took immediate steps to secure our network environment, hired cybersecurity experts to assist us in our investigation and

containment, and notified law enforcement. We are also working with our cybersecurity experts to continue to strengthen our security controls."

109.    The Notice Letter further acknowledged that the Data Breach would cause inconvenience to affected individuals by providing numerous "steps" for Class Members to take in an attempt to mitigate the harm caused by the Data Breach, and that financial harm would likely occur, stating: "[W]e encourage you to remain vigilant against incidents of identity theft and fraud and to review your account statements and credit reports for suspicious activity. You can review the enclosed *Steps You Can Take to Help Protect Your Information* to learn helpful tips on additional steps you can take to help protect against possible information misuse. If you suspect there have been any incidents of identity theft, you should report the incident to local law enforcement or your state attorney general."

110.    At Defendant's suggestion, Plaintiff and Class Members are trying to mitigate the damage that Progressive Leasing has caused them. Given the kind of PII Progressive Leasing made accessible to hackers, however, Plaintiff and Class Members are certain to incur additional damages. Because identity thieves have their PII, Plaintiff and all Class Members will need to have identity theft monitoring protection for the rest of their lives. Some may even need to go through the long and arduous process of getting a new Social Security number, with all the loss of credit and employment difficulties that come with a new number.[32] None of this should have happened.

111.    Because of the value of its collected and stored data, the financial industry has experienced disproportionally higher numbers of data theft events than other industries. For this

---

[32] *Will a New Social Security Number Affect Your Credit?*, LEXINGTON LAW (Nov. 16, 2015), https://www.lexingtonlaw.com/blog/credit-101/will-a-new-social-security-number-affect-your-credit.html.

reason, Progressive Leasing knew or should have known about these dangers and strengthened its data security accordingly. Progressive Leasing was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

**H. The Data Breach Was Foreseeable and Preventable**

112.    Data security breaches have dominated the headlines for the last two decades. And it doesn't take an IT industry expert to know it. The general public can tell you the names of some of the biggest cybersecurity breaches: Target,[33] Yahoo,[34] Marriott International,[35] Chipotle, Chili's, Arby's,[36] and others.[37]

113.    Progressive Leasing should certainly have been aware, and indeed was aware, that it was at risk for a data breach that could expose the PII that it collected and maintained.

114.    Progressive Leasing was clearly aware of the risks it was taking and the harm that could result from inadequate data security, and it could have prevented this Data Breach.

---

[33] Michael Kassner, *Anatomy of the Target Data Breach: Missed Opportunities and Lessons Learned*, ZDNET (Feb. 2, 2015), https://www.zdnet.com/article/anatomy-of-the-target-data-breach-missed-opportunities-and-lessons-learned/.

[34] Martyn Williams, *Inside the Russian Hack of Yahoo: How They Did It*, CSOONLINE.COM (Oct. 4, 2017), https://www.csoonline.com/article/3180762/inside-the-russian-hack-of-yahoo-how-they-did-it.html.

[35] Patrick Nohe, *The Marriot Data Breach: Full Autopsy*, THE SSL STORE: HASHEDOUT (Mar. 22, 2019), https://www.thesslstore.com/blog/autopsying-the-marriott-data-breach-this-is-why-insurance-matters/.

[36] Alfred Ng, *FBI Nabs Alleged Hackers in Theft of 15M Credit Cards from Chipotle, Others*, CNET (Aug. 1, 2018), https://www.cnet.com/news/fbi-nabs-alleged-hackers-in-theft-of-15m-credit-cards-from-chipotle-others/?ftag=CMG-01-10aaa1b.

[37] *See, e.g.*, Taylor Armerding, *The 18 Biggest Data Breaches of the 21st Century*, CSO ONLINE (Dec. 20, 2018), https://www.csoonline.com/article/2130877/the-biggest-data-breaches-of-the-21st-century.html.

115.    Data disclosures and data breaches are preventable.[38] As Lucy Thompson wrote in the Data Breach and Encryption Handbook, "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[39] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised[.]"[40]

116.    "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures … Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a *data breach never occurs*."[41]

117.    In a Data Breach like this, many failures laid the groundwork for the Breach. The FTC has published guidelines that establish reasonable data security practices for businesses. The FTC guidelines emphasize the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.[42] The guidelines establish that businesses should protect the confidential information that they keep; properly

---

[38] Lucy L. Thompson, "Despite the Alarming Trends, Data Breaches Are Preventable," *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012).

[39] *Id.* at 17.

[40]*Id.* at 28.

[41]*Id.*

[42] FTC, *Protecting Personal Information: A Guide for Business*, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies for installing vendor-approved patches to correct security problems. The guidelines also recommended that businesses utilize an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating hacking attempts; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

118.    Upon information and belief, Progressive Leasing failed to maintain many reasonable and necessary industry standards necessary to prevent a data breach, including the FTC's guidelines. Upon information and belief, Progressive Leasing also failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework, NIST Special Publications 800-53, 53A, or 800-171; the Federal Risk and Authorization Management Program (FEDRAMP); or the Center for Internet Security's Critical Security Controls (CIS CSC), which are well respected authorities in reasonable cybersecurity readiness.

119.    As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[43]

120.    To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Progressive Leasing could and should have implemented, as recommended by the Federal Bureau of Investigation, the following measures:

- Implement an awareness and training program.  Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

---

[43] *See* How to Protect Your Networks from RANSOMWARE, at 3, *available at* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[44]

121.    The threat continues. In August 2022, the Consumer Finance Protection Bureau (CFPB) published a circular on data security. The CFPB noted that "[w]idespread data breaches and cyberattacks have resulted in significant harms to consumers, including monetary loss, identity theft, significant time and money spent dealing with the impacts of the breach, and other forms of financial distress," and the circular concluded that the provision of insufficient security for consumers' data can violate the prohibition on "unfair acts or practices" in the Consumer Finance Protection Act (CFPA).

122.    Further, to prevent and detect ransomware attacks, Progressive Leasing could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

- **Update and patch your computer.** Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks….

- **Use caution with links and when entering website addresses**.  Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender

---

[44] *Id.* at 3-4.

organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net) ….

- **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe**.  Check a website's security to ensure the information you submit is encrypted before you provide it….

- **Verify email senders**.  If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself**.  Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic….[45]

123.    In addition, to prevent and detect ransomware attacks, Progressive Leasing could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

---

[45] *See* Security Tip (ST19-001) Protecting Against Ransomware (original release date Apr. 11, 2019), *available at* https://us-cert.cisa.gov/ncas/tips/ST19-001.

- **Secure internet-facing assets**

    o Apply latest security updates
    o Use threat and vulnerability management
    o Perform regular audits; remove privileged credentials

- **Thoroughly investigate and remediate alerts**

    o Prioritize and treat commodity malware infections as potential full compromises;

- **Include IT Pros in security discussions**

    o Ensure collaboration among [security operations], [security admins], and [information technology admins to configure servers and other endpoints securely;

- **Build credential hygiene**

    o Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

- **Apply principle of least-privilege**

    o Monitor for adversarial activities
    o Hunt for brute force attempts
    o Monitor for cleanup of Event Logs
    o Analyze logon events

- **Harden infrastructure**

    o Use Windows Defender Firewall
    o Enable tamper protection
    o Enable cloud-delivered protection
    o Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[46]

---

[46] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/.

124.    Given that Progressive Leasing was storing the PII of almost 200,000 individuals, Progressive Leasing could and should have implemented all of the above measures to prevent and detect ransomware attacks. These are basic, common-sense email security measures that every business, not only financial businesses, should be doing. Progressive Leasing, with its heightened standard of care should be doing even more.

125.    Specifically, among other failures, Progressive Leasing had far too much confidential unencrypted information held on its systems.  Such PII should have been segregated into an encrypted system.[47]  Indeed, the United States Department of Health and Human Services' Office for Civil Rights urges the use of encryption of data containing sensitive personal information, stating "[o]ur message to these organizations is simple: encryption is your best defense against these incidents."[48]

126.    Charged with handling sensitive PII, including financial information, Defendant knew, or should have known, the importance of safeguarding its employees' and customers' PII that was entrusted to it and of the foreseeable consequences if its data security systems were breached. This includes the significant costs that would be imposed on its employees and customers after a breach.  Progressive Leasing failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

127.    With respect to training, Defendant specifically failed to:

---

[47] *See, e.g.,* Adnan Raja, *How to Safeguard Your Business Data with Encryption*, Aug. 14, 2018, https://digitalguardian.com/blog/how-safeguard-your-business-data-encryption.

[48] "Stolen Laptops Lead to Important HIPAA Settlements," U.S. Dep't of Health and Human Services (Apr. 22, 2014), available at https://wayback.archive-it.org/3926/20170127085330/https://www.hhs.gov/about/news/2014/04/22/stolen-laptops-lead-to-important-hipaa-settlements.html.

- Implement a variety of anti-ransomware training tools, in combination, such as computer-based training, classroom training, monthly newsletters, posters, login alerts, email alerts, and team-based discussions;

- Perform regular training at defined intervals such as bi-annual training and/or monthly security updates; and

- Craft and tailor different approaches to different employees based on their base knowledge about technology and cybersecurity.

128.    The PII was also maintained on Progressive Leasing computer system in a condition vulnerable to cyberattacks, such as through the infiltration of Defendant's systems through ransomware attacks. The mechanism of the cyberattack and the potential for improper disclosure of Plaintiff's and Class Members' PII was a known risk to Progressive Leasing, and thus Progressive Leasing was on notice that failing to take reasonable steps necessary to secure the PII from those risks left it in a vulnerable position.

129.    In sum, this Data Breach could have readily been prevented through the use of industry standard network segmentation and encryption of all confidential information.

130.    Plaintiff and Class Members entrusted their PII to Progressive Leasing as a condition of employment and to receive financial services. Plaintiff and Class Members understood and expected that Progressive Leasing or anyone in Defendant's position would safeguard their PII against cyberattacks, delete or destroy PII that Progressive Leasing was no longer required to maintain, and timely and accurately notify them if their PII was compromised.

## I.   The Monetary Value of Privacy Protections and Private Information

131.    The fact that Plaintiff's and Class Members' PII was stolen means that Class Members' information is likely for sale by cybercriminals and will be misused in additional instances in the future. Indeed, there is already evidence that Plaintiff's PII is on the dark web.

132.    At all relevant times, Defendant was well aware that the PII it collects from Plaintiff and Class Members is highly sensitive and of significant value to those who would use it for wrongful purposes.

133.    As discussed above, PII is a valuable commodity to identity thieves. As the FTC recognizes, identity thieves can use this information to commit an array of crimes including identify theft, and medical and financial fraud.[49]

134.    At an FTC public workshop in 2001, then-Commissioner Orson Swindle described the value of a consumer's personal information:

> The use of third party information from public records, information aggregators and even competitors for marketing has become a major facilitator of our retail economy. Even [Federal Reserve] Chairman [Alan] Greenspan suggested here some time ago that it's something on the order of the life blood, the free flow of information.[50]

135.    Commissioner Swindle's 2001 remarks are even more relevant today, as consumers' personal data functions as a "new form of currency" that supports a $26 Billion per year online advertising industry in the United States.[51]

136.    The FTC has also recognized that consumer data is a new (and valuable) form of currency. In an FTC roundtable presentation, another former Commissioner, Pamela Jones

---

[49] Federal Trade Commission, *Warning Signs of Identity Theft* (Sept. 2018), https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last accessed November 30, 2022). Attached hereto at Exhibit 13.

[50] *Public Workshop: The Information Marketplace: Merging and Exchanging Consumer Data*, FED. TRADE COMM'N Tr. at 8:2-8 (Mar. 13, 2001), https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last accessed November 30, 2022). Attached hereto at Exhibit 14.

[51] *See* Julia Angwin & Emily Steel, *Web's Hot New Commodity: Privacy*, The Wall Street Journal (Feb. 28, 2011), https://allthingsd.com/20110228/webs-hot-new-commodity-privacy/ [hereinafter *Web's New Hot Commodity*] (last accessed November 30, 2022). Attached hereto at Exhibit 15.

Harbour, underscored this point:

> Most consumer cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency.  The larger the data set, the greater potential for analysis—and profit.[52]

137.    Recognizing the high value that consumers place on their PII, many companies now offer consumers an opportunity to sell this information.[53]  The idea is to give consumers more power and control over the type of information that they share and who ultimately receives that information. And, by making the transaction transparent, consumers will make a profit from their PII. This business has created a new market for the sale and purchase of this valuable data.

138.    Consumers place a high value not only on their PII, but also on the privacy of that data. Researchers have begun to shed light on how much consumers value their data privacy, and the amount is considerable. Indeed, studies confirm that the average direct financial loss for victims of identity theft in 2014 was $1,349.[54]

139.    As discussed above, the value of Plaintiff's and Class Members' PII on the black market is substantial.

140.    The ramifications of Defendant's failure to keep Plaintiff's and Class Members' PII secure are long-lasting and severe. Once PII is stolen, fraudulent use of that information and

---

[52] *Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtable*, FED. TRADE COMM'N (Dec. 7, 2009), https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last accessed November 30, 2022). Attached hereto at Exhibit 16.

[53] *Web's Hot New Commodity*, *supra* note 17.

[54] *See* U.S. Dep't of Justice, *Victims of Identity Theft,* OFFICE OF JUSTICE PROGRAMS: BUREAU OF JUSTICE STATISTICS 1 (Nov. 13, 2017), https://www.bjs.gov/content/pub/pdf/vit14.pdf [hereinafter *Victims of Identity Theft*] (last accessed November 30, 2022). Attached hereto at Exhibit 17.

damage to victims may continue for years.

141.    Victims may not realize their identity has been compromised until long after it has happened.[55] This gives thieves ample time to seek multiple treatments under the victim's name. Forty percent of consumers found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.[56]

142.    At all relevant times, Defendant was well-aware, or reasonably should have been aware, that the PII it maintains is highly sensitive and could be used for wrongful purposes by third parties, such as identity theft and fraud.

143.    Had Defendant remedied the deficiencies in its security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, Defendant would have prevented the ransomware attack into its systems and, ultimately, the theft of its employees' and customers' PII.

144.    Information about, or related to, an individual for which there is a possibility of logical association with other information is of great value to hackers and thieves. Indeed, "there is significant evidence demonstrating that technological advances and the ability to combine disparate pieces of data can lead to identification of a consumer, computer or device even if the individual pieces of data do not constitute PII."[57] For example, different PII elements from various

---

[55] *See, e.g.*, *Survey on Medical Identity Theft*, Ponemon Institute, June 2012, https://www.ponemon.org/local/upload/file/Third_Annual_Survey_on_Medical_Identity_Theft_FINAL.pdf (last accessed November 30, 2022).
[56] *The Potential Damages and Consequences of Medical Identify Theft and Healthcare Data Breaches*, EXPERIAN, (Apr. 2010), https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf (last accessed November 30, 2022).
[57] *Protecting Consumer Privacy in an Era of Rapid Change: A Proposed Framework for Businesses and Policymakers, Preliminary FTC Staff Report*, FED. TRADE COMM'N 35-38 (Dec.

sources may be able to be linked in order to identify an individual, or access additional information about or relating to the individual.[58] Based upon information and belief, the unauthorized parties utilized the PII they obtained through the Data Breach to obtain additional information from Plaintiff and Class Members that was misused.

145.    In addition, as technology advances, computer programs may scan the Internet with wider scope to create a mosaic of information that may be used to link information to an individual in ways that were not previously possible. This is known as the "mosaic effect."

146.    Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts. Thus, even if payment card information was not involved in the Data Breach, though it was here, the unauthorized parties could use Plaintiff's and Class Members' PII to access accounts, including, but not limited to email accounts and financial accounts, to engage in the fraudulent activity identified by Plaintiff.

147.    Given these facts, any financial or other type of entity that transacts business with customers and then compromises the privacy of its customers' PII has thus deprived them of the full monetary value of the transaction with the entity.

148.    Acknowledging the damage to Plaintiff and Class Members, Defendant instructed customers like Plaintiff to "remain vigilant against incidents of identity theft and fraud[.]" Plaintiff and Class Members now face an impending, substantial risk of identity theft and financial fraud.

---

2010), https://www.ftc.gov/reports/preliminary-ftc-staff-report-protecting-consumer-privacy-era-rapid-change-proposed-framework (last accessed November 30, 2022).
[58] *See id.* (evaluating privacy framework for entities collecting or using consumer data with can be "reasonably linked to a specific consumer, computer, or other device").

149.    In short, the PII exposed is of great value to hackers and cyber criminals and the data compromised in the Data Breach can be used in a variety of unlawful manners, including opening new credit and financial accounts in users' names.

**J.  The Data Breach's Impact on Plaintiff and Class Members**

150.    Progressive Leasing received Plaintiff's PII in connection with providing certain services to them. In requesting and maintaining Plaintiff's PII for business purposes, Progressive Leasing expressly and impliedly promised, and undertook a duty, to act reasonably in its handling of Plaintiff's PII. Progressive Leasing, however, did not take proper care of Plaintiff's PII, leading to its exposure to and exfiltration by cybercriminals as a direct result of Progressive Leasing inadequate data security measures.

151.    On or around September 25, 2023, Progressive Leasing sent Plaintiff notice concerning the Data Breach. The letter stated that Progressive Leasing experienced a cybersecurity attack and that the incident may have resulted in unauthorized access to Plaintiff's PII stored on Progressive Leasing's systems. The notice stated that the compromised information that was present on the impacted files included one or more of the following data elements: first and last names, addresses, phone numbers, Social Security numbers, date of birth, bank account numbers, monthly gross income, credit limit, and email addresses. The notice further encouraged that Plaintiff and Class Members "remain vigilant against incidents of identity theft and fraud and to review your account statements and credit reports for suspicious activity." Progressive Leasing also offered identity theft protection services through Experian, but only for a period of one year.

152.    Defendant's conduct, which allowed the Data Breach to occur, caused Plaintiff significant injuries and harm, including but not limited to, the following—Plaintiff immediately

devoted (and must continue to devote) time, energy, and money to: closely monitoring their bills, records, and credit and financial accounts; changing login and password information on any sensitive account even more frequently than they already do; more carefully screening and scrutinizing phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; searching for suitable identity theft protection and credit monitoring services and paying for such services to protect themselves; and placing fraud alerts and/or credit freezes on their credit file. Plaintiff has taken or will be forced to take these measures in order to mitigate her potential damages as a result of the Breach.

153.     Once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiff will need to maintain these heightened measures for years, and possibly her entire life. Consumer victims of data breaches are more likely to become victims of identity fraud.[59]

154.     Plaintiff and Class Members greatly value their privacy, especially while receiving financial services. Plaintiff and Class Members did not receive the full benefit of their bargain when paying for financial services, and instead received services that were of a diminished value to those described in their agreements with Progressive Leasing for the benefit and protection of Plaintiff and Class Members and their respective PII. Plaintiff and Class Members were damaged in an amount at least equal to the difference in the value between the services they thought they paid for (which would have included adequate data security protection) and the services they actually received.

---

[59] *2014 LexisNexis True Cost of Fraud Study*, LᴇxɪsNᴇxɪs (Aug. 2014), https://www.lexisnexis.com/risk/downloads/assets/true-cost-fraud-2014.pdf (last accessed November 30, 2022).

155.     Plaintiff and Class Members would not have obtained financial services from Progressive Leasing, or paid the amount they did to receive such, had they known that Progressive Leasing would negligently fail to adequately protect their PII. Indeed, Plaintiff paid Progressive Leasing for financial services with the expectation that Progressive Leasing would keep their PII secure and inaccessible from unauthorized parties. Plaintiff and Class Members would not have obtained services from Progressive Leasing had they known that Defendant failed to properly train its employees, lacked safety controls over its computer network, and did not have proper data security practices to safeguard their Private Information from criminal theft and misuse.

156.     Plaintiff and Class Members have lost confidence in Progressive Leasing as a result of the Data Breach.

157.     As a direct result of Defendant's intentional, willful, reckless, and negligent conduct which resulted in the Data Breach, unauthorized parties were able to access, acquire, view, publicize, and/or otherwise commit the identity theft and misuse of Plaintiff's and Class Members' PII as detailed above, and Plaintiff and members of the Class are at a heightened and increased substantial risk of suffering identity theft and fraud.

158.     Plaintiff and Class Members are also at a continued risk of harm because their PII remains in Progressive Leasing's systems, which have already been shown to be susceptible to compromise and attack and are subject to further attack so long as Progressive Leasing fails to undertake the necessary and appropriate data security measures to protect the PII in its possession.

159.     As a result of the Data Breach, and in addition to the time Plaintiff and Class Members have spent and anticipate spending to mitigate the impact of the Data Breach on their lives, Plaintiff have also suffered emotional distress from the public release of their PII, which they

believed would be protected from unauthorized access and disclosure. The emotional distress they have experienced includes anxiety and stress resulting from the unauthorized bad actors viewing, selling, and misusing their PII for the purposes of identity theft and fraud.

160.    Plaintiff and Class Members have suffered damage to and diminution in the value of their highly sensitive and confidential PII—a form of property that Plaintiff and Class Members entrusted to Progressive Leasing and which was compromised as a result of the Data Breach Progressive Leasing failed to prevent. Plaintiff and Class Members have also suffered a violation of their privacy rights as a result of Progressive Leasing unauthorized disclosure of their PII.

161.    The risks associated with identity theft are serious. While some identity theft victims can resolve their problems quickly, others spend hundreds to thousands of dollars and many days repairing damage to their good name and credit record. Some consumers victimized by identity theft may lose out on job opportunities, or be denied loans for education, housing or cars because of negative information on their credit reports. In rare cases, they may even be arrested for crimes they did not commit.

162.    Some of the injuries and risks associated with the loss of PII have already manifested themselves in Plaintiff and other Class Members' lives. Each Class Member received a cryptically written notice letter from Defendant stating that their PII was released, and that they should remain vigilant for fraudulent activity, with no other explanation of where this PII could have gone, or who might have access to it.

163.    In addition to a remedy for the economic harm, Plaintiff and Class Members maintain an undeniable interest in ensuring that their PII remains secure and is not subject to further misappropriation and theft.

## K.  Plaintiff's Experiences

164.    Mr. Guzman is a customer of Progressive Leasing since January 2022. In January 2022, he leased jewelry through Progressive Leasing, which was paid off in late 2022. About two months ago, Mr. Guzman leased a laptop through Progressive Leasing, which he has paid off.

165.    Mr. Guzman suffered, and continues to suffer from, actual and imminent identity theft and misuse of his PII as a direct and/or proximate result of Progressive Leasing actions and inactions.

166.    Progressive Leasing conduct, which allowed the Data Breach to occur, caused Plaintiff Guzman significant injuries and harm, including but not limited to, the following—Mr. Guzman immediately devoted (and must continue to devote) time, energy, and money to: closely monitor his bills, records, and credit and financial accounts and more carefully screen and scrutinize phone calls, emails, and other communications to ensure that he is not being targeted in a social engineering or spear phishing attack. Mr. Guzman has taken or will be forced to take these measures in order to mitigate his potential damages that are fairly traceable to the Data Breach.

167.    Once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, in addition to the increased, imminent, and substantial risk of a future data breach and harm, Mr. Guzman will need to maintain these heightened measures for years, and possibly his entire life.

168.    Mr. Guzman greatly values his privacy, especially while receiving financial services. He would not have obtained financial services from Progressive Leasing, or paid the amount he did to receive such, had he known that Progressive Leasing would negligently fail to adequately protect his PII. Indeed, Mr. Guzman paid Progressive Leasing for financial services

with the expectation that Progressive Leasing would keep his PII secure and inaccessible from unauthorized parties, as promised by Progressive Leasing.

169.    Mr. Guzman is also at a continued imminent and substantial risk of harm because his PII remains in Progressive Leasing systems, which have already been shown to be susceptible to compromise and attack and are subject to an increased and imminent future attack.

170.    As a result of the Data Breach, and in addition to the time Mr. Guzman has spent and anticipates spending to mitigate the impact of the Data Breach on his life, Mr. Guzman also suffered emotional distress from the public release of his PII, which he believed would be protected from unauthorized access and disclosure. The emotional distress he experienced, and will continue to experience, includes anxiety and stress resulting from the unauthorized bad actors viewing, selling, and misusing their PII and PHI for the purposes of identity theft and fraud.

171.    Additionally, Mr. Guzman has suffered damage to and diminution in the value of his highly sensitive and confidential PII—a form of property that Mr. Guzman provided and entrusted to Progressive Leasing, and which was compromised as a result of the Data Breach Progressive Leasing failed to prevent. Mr. Guzman has also suffered a violation of his privacy rights as a result of Progressive Leasing's unauthorized disclosure of his PII.

172.    The free credit monitoring and identity restoration services offered by Progressive Leasing after the Data Breach were and continue to be ineffective because these services would have shared Mr. Guzman's information with third parties and could not guarantee complete privacy of his sensitive information.

173.    The time spent dealing with these incidents resulting from the Data Breach is time Mr. Guzman.  Mr. Guzman otherwise would have spent on other activities, such as work and/or

recreation. Moreover, the time Plaintiff lost was spent at Progressive Leasing direction. Indeed, in the notice letter Plaintiff received, Progressive Leasing directed Plaintiff to spend time by reviewing his accounts and credit reports for unauthorized activity.

## **CLASS ACTION ALLEGATIONS**

174.    Plaintiff brings this action individually and on behalf of all other persons similarly situated, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(3), and/or 23(c)(4).

175.    Specifically, Plaintiff proposes the following Nationwide Class:

All persons residing in the United States whose PII was compromised as a result of the Data Breach discovered on or about September 2023 and who were sent notice of the Data Breach.

176.    Excluded from the Class are the (i) owners, officers, directors, employees, agents and/or representatives of Progressive Leasing and its parent entities, subsidiaries, affiliates, successors, and/or assigns, and (ii) the Court, Court personnel, and members of their immediate families.

177.    Plaintiff reserves the right to modify, change, amend, or expand the definitions of the Nationwide Class based upon discovery and further investigation.

178.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

179.    **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The members of the Class are so numerous that joinder of all Class Members would be impracticable. On information and belief, the Nationwide Class number in at least the tens of thousands.

180.    **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2).** Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual members of the Class. Such common questions of law or fact include, *inter alia*:

    a.  Whether Progressive Leasing willfully, recklessly, negligently and/or wantonly failed to maintain and/or execute reasonable procedures designed to prevent unauthorized access to Plaintiff's and Class Members' PII;

    b.  Whether Progressive Leasing was negligent or wanton in the manner in which it stored Plaintiff's and Class Members' PII;

    c.  Whether Progressive Leasing owed a duty to Plaintiff and Class Members to exercise reasonable care in protecting and securing their PII;

    d.  Whether Progressive Leasing breached its duty to exercise reasonable care in protecting and securing Plaintiff's and Class Members' PII;

    e.  Whether Progressive Leasing was negligent in failing to secure Plaintiff's and Class Members' PII;

    f.  Whether Progressive Leasing failure to comply with Section 5 of the Federal Trade Commission Act (15 U.S.C. §45) constitutes negligence *per se*;

    g.  Whether Progressive Leasing breached its contracts by failing to maintain the privacy and security of Plaintiff's and Class Members' PII;

    h.  Whether by publicly disclosing Plaintiff's and Class Members' PII without authorization, Progressive Leasing invaded Plaintiff's and Class Members' privacy;

i.  Whether by publicly disclosing Plaintiff's and Class Members' PII without authorization, Progressive Leasing breached the duty of confidence it owed to Plaintiff and Class Members;

j.  Whether by publicly disclosing Plaintiff's and Class Members' PII without authorization, Progressive Leasing breached the fiduciary duties it owed to Plaintiff and Class Members;

k.  Whether Progressive Leasing was unjustly enriched when it took money from Plaintiff and Class Members and failed to provide reasonable data security measures to protect Plaintiff's and Class Members' PII;

l.  Whether Plaintiff and Class Members sustained damages as a result of Progressive Leasing failure to secure and protect their PII/PHI; and,

m.  Whether injunctive relief is necessary to ensure Progressive Leasing implements reasonable security measures to protect the PII of Plaintiff and the Class Members against any future data breaches by Progressive Leasing.

181.    Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of themselves and other members of the Class. Similar or identical common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that predominate in this action.

182.    **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the claims of the other members of the Class because, among other things, all Class Members were similarly injured through Defendant's uniform misconduct described above and

were thus all subject to the Data Breach alleged herein. Further, there are no defenses available to Defendant that are unique to Plaintiff.

183.    **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate representative of the Class because their interests do not conflict with the interests of the Class they seek to represent, they have retained counsel competent and experienced in complex class action litigation, and they will prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiff and his counsel.

184.    **Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Defendant has acted and/or refused to act on grounds that apply generally to the Class, making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. R. Civ. P. 23 (b)(2).

185.    **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for members of the Class to individually seek redress for Defendant's wrongful conduct. Even if members of the Class could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

**CAUSES OF ACTION**
**COUNT I**
**NEGLIGENCE**
**(ON BEHALF OF PLAINTIFF AND THE CLASS)**

186.    Plaintiff restates and realleges allegations stated in the preceding paragraph as if fully set forth herein.

187.    Progressive Leasing knowingly collected, came into possession of, and maintained Plaintiff's and Class Members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such Private Information from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

188.    Defendant owed a duty of care not to subject Plaintiff's and the Class's PII to an unreasonable risk of exposure and theft because Plaintiff and the Class were foreseeable and probable victims of any inadequate security practices.

189.    Defendant owed numerous duties to Plaintiff and the Class, including the following:

a.  To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting PII in its possession;

b.  To protect PII using reasonable and adequate security procedures and systems that are compliant with industry-standard practices; and

c.  To implement processes to quickly detect a data breach and to timely act on warnings about data breaches.

190.    Defendant also breached its duty to Plaintiff and Class Members to adequately protect and safeguard PII by disregarding standard information security principles, despite obvious

risks, and by allowing unmonitored and unrestricted access to unsecured PII.  Furthering its dilatory practices, Defendant failed to provide adequate supervision and oversight of the PII with which it was and is entrusted, despite the known risk and foreseeable likelihood of breach and misuse, which permitted a malicious third party to gather Plaintiff's and Class Members' PII and misuse the PII and intentionally disclose it to others without consent.

191.    Defendant knew, or should have known, of the risks inherent in collecting and storing PII and the importance of adequate security. Defendant knew or should have known about numerous well-publicized data breaches within the finance industry.

192.    Defendant knew, or should have known, that its data systems and networks did not adequately safeguard Plaintiff and Class Members' PII.

193.    Defendant breached its duties to Plaintiff and Class Members by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PII.

194.    Because Defendant knew that a breach of its systems would damage thousands of its customers' PII, including Plaintiff's and Class Members', Defendant had a duty to adequately protect its data systems and the PII contained thereon.

195.    Defendant's duty of care to use reasonable security measures arose because of the special relationship that existed between Defendant and its employees, which is recognized by statute, regulations, and the common law. Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

196.    In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . .

practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

197.    Defendant's own conduct also created a foreseeable risk of harm to Plaintiff and Class Members and their PII. Defendant's misconduct included failing to: (1) secure Plaintiff's and Class Members' PII; (2) comply with industry standard security practices; (3) implement adequate system and event monitoring; and (4) implement the systems, policies, and procedures necessary to prevent this type of data breach.

198.    Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' PII and by failing to provide timely notice of the Data Breach.  The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

    a.  Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

    b.  Failing to adequately monitor the security of Defendant's networks and systems;

    c.  Allowing unauthorized access to Class Members' PII; and

    d.  Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

199.    Through Defendant's acts and omissions described in this Complaint, including its failure to provide adequate security and its failure to protect Plaintiff's and Class Members' PII from being foreseeably captured, accessed, disseminated, stolen and misused, Defendant unlawfully breached its duty to use reasonable care to adequately protect and secure Plaintiff's and Class Members' PII during the time it was within Defendant's possession or control.

200.     Defendant's conduct was grossly negligent and departed from all reasonable standards of care, including, but not limited to failing to adequately protect the PII and failing to provide Plaintiff and Class Members with timely notice that their sensitive Private Information had been compromised.

201.     Neither Plaintiff nor the other Class Members contributed to the Data Breach and subsequent misuse of their PII as described in this Complaint.

202.     As a direct and proximate cause of Defendant's conduct, Plaintiff and Class Members suffered damages as alleged above.

203.     Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *inter alia*, (i) strengthens its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide lifetime free credit monitoring to all Class Members.

<b><u>COUNT II</u></b><br><b><u>BREACH OF CONFIDENCE</u></b><br><b>(ON BEHALF OF PLAINTIFF AND THE CLASS)</b>

204.     Plaintiff restates and realleges allegations stated from the preceding paragraphs as if fully set forth herein.

205.     During Plaintiff's and Class members' interactions with Defendant, Defendant was fully aware of the confidential nature of the PII that Plaintiff and Class members provided to it.

206.     As alleged herein and above, Defendant's relationship with Plaintiff and Class members was governed by expectations that Plaintiff and Class members' PII would be collected, stored, and protected in confidence, and would not be accessed by, acquired by, appropriated by,

disclosed to, encumbered by, exfiltrated by, released to, stolen by, used by, and/or viewed by unauthorized third parties.

207. Plaintiff and Class members provided their respective PII to Defendant with the explicit and implicit understanding that Defendant would protect and not permit the PII to be accessed by, acquired by, appropriated by, disclosed to, encumbered by, exfiltrated by, released to, stolen by, used by, and/or viewed by unauthorized third parties.

208. Plaintiff and Class members also provided their PII to Defendant with the explicit and implicit understanding that Defendant would take precautions to protect their PII from unauthorized access, acquisition, appropriation, disclosure, encumbrance, exfiltration, release, theft, use, and/or viewing, such as following basic principles of protecting its networks and data systems.

209. Defendant voluntarily received, in confidence, Plaintiff's and Class members' PII with the understanding that the PII would not be accessed by, acquired by, appropriated by, disclosed to, encumbered by, exfiltrated by, released to, stolen by, used by, and/or viewed by the public or any unauthorized third parties.

210. Due to Defendant's failure to prevent, detect and avoid the Data Breach from occurring by, inter alia, not following best information security practices to secure Plaintiff's and Class members' PII, Plaintiff's and Class members' PII was accessed by, acquired by, appropriated by, disclosed to, encumbered by, exfiltrated by, released to, stolen by, used by, and/or viewed by unauthorized third parties beyond Plaintiff's and Class members' confidence and without their express permission.

211.    As a direct and proximate cause of Defendant's actions and/or omissions, Plaintiff and Class members have suffered damages, as alleged herein.

212.    But for Defendant's failure to maintain and protect Plaintiff's and Class members' PII in violation of the parties' understanding of confidence, their PII would not have been accessed by, acquired by, appropriated by, disclosed to, encumbered by, exfiltrated by, released to, stolen by, used by, and/or viewed by unauthorized third parties. The Data Breach was the direct and legal cause of the misuse of Plaintiff's and Class members' PII and the resulting damages.

213.    The injury and harm Plaintiff and Class members suffered and will continue to suffer was the reasonably foreseeable result of Defendant's unauthorized misuse of Plaintiff's and Class members' PII. Defendant knew its data systems and protocols for accepting and securing Plaintiff's and Class members' PII had security and other vulnerabilities that placed Plaintiff's and Class members' PII in jeopardy.

214.    As a direct and proximate result of Defendant's breaches of confidence, Plaintiff and Class Members have suffered and will continue to suffer injury, as alleged herein, including but not limited to: (i) actual identity theft, (ii) the compromise, publication, and/or theft of their PII, (iii) out-of-pocket expenses associated with the prevention, detection and recovery from identity theft and/or unauthorized use of their PII, (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft, (v) the continued risk to their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Class Members' PII in

its continued possession, (vi) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Representative Plaintiff and Class Members, (vii) the diminished value of Representative Plaintiff's and Class Members' PII, and (viii) the diminished value of Defendant's services for which Representative Plaintiff and Class Members paid and/or received.

## <u>COUNT III</u>
## <u>BREACH OF IMPLIED CONTRACT</u>
## (ON BEHALF OF PLAINTIFF AND THE CLASS)

215.    Plaintiff restates and realleges allegations stated from the preceding paragraphs as if fully set forth herein.

216.    Progressive Leasing provided financial services to Plaintiff and Class Members, as well as employment to Class members, in exchange for payment in the case of the former, and required Plaintiff and Class Members to provide Progressive Leasing with their PII in order to receive services and employment.

217.    Defendant, as employer and retainer, held the Private Information on behalf of Plaintiff and Class Members. Holding Plaintiff's and Class Members' Private Information was part of Defendant's regular business practices, as agreed to by the parties. When Plaintiff and Class Members joined Defendant's employment and/or received services from Defendant, they agreed to have their Private Information stored in Defendant's network.

218.    Plaintiff and Class Members entered implied contracts with Defendant in which Defendant agreed to safeguard and protect such Private Information and to timely detect any breaches of their Private Information. Plaintiff and Class Members were required to share Private Information to obtain employment and make payments to purchase products from Defendant. In

entering such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

219.    Plaintiff and Class Members fully performed their obligations under their implied contracts with Defendant.

220.    Defendant's implied promises to Plaintiff and Class Members include, but are not limited, to, (1) taking steps to ensure that anyone who is granted access to Private Information also protect the confidentiality of that data; (2) taking steps to ensure that the Private Information that is placed in the control of its employees is restricted and limited to achieve an authorized business purpose; (3) restricting access to qualified and trained employees and/or agents; (4) designing and implementing appropriate retention policies to protect the Private Information against criminal data breaches; (5) applying or requiring encryption; (6) implementing multifactor authentication for access; and (7) taking other steps to protect against foreseeable data breaches.

221.    Defendant breached these implied promises it made with Plaintiff and Class Members by failing to safeguard and protect their Private Information and by failing to notify Plaintiff and Class Members thereof within a reasonable time.

222.    Plaintiff and Class Members would not have entrusted their Private Information to Progressive Leasing in the absence of such an implied contract.

223.    Had Progressive Leasing disclosed to Plaintiff and the Class that it did not have adequate computer systems and security practices in place to secure such sensitive data, Plaintiff and Class Members would not have provided their Private Information to Progressive Leasing.

224.    Progressive Leasing recognized that Plaintiff's and Class Members' Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain with Plaintiff and Class Members.

225.    Progressive Leasing violated these implied contracts by failing to employ reasonable and adequate security measures to secure Plaintiff's and Class Members' Private Information.

226.    Plaintiff and Class Members have been damaged by Defendant's conduct, including the harms and injuries arising from the Data Breach now and in the future, as alleged herein.

227.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *inter alia*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide free lifetime credit monitoring to all Class Members.

**COUNT IV**
**UNJUST ENRICHMENT**
**(ON BEHALF OF PLAINTIFF AND THE CLASS)**

228.    Plaintiff restates and realleges allegations stated from the preceding paragraphs as if fully set forth herein.

229.    This Count is pleaded in the alternative to Count III above.

230.    Plaintiff and Class Members conferred a benefit on Defendant. Specifically, they provided Defendant with their Private Information, which Private Information has inherent value. They also provided money to Defendant when receiving services from Defendant. In exchange, Plaintiff and Class Members should have been entitled to have Defendant protect their Private Information with adequate data security.

231.    Defendant knew that Plaintiff and Class Members conferred these benefits upon it and accepted and retained such benefits by accepting and retaining the Private Information entrusted to it, while also accepting the payments made to it. Defendant profited from Plaintiff's retained data and used Plaintiff's and Class Members' Private Information for business purposes.

232.    Defendant failed to secure Plaintiff's and Class Members' Private Information and, therefore, did not fully compensate Plaintiff or Class Members for the value that their Private Information provided.

233.    Defendant acquired the Private Information through inequitable record retention as it failed to disclose the inadequate security practices previously alleged.

234.    If Plaintiff and Class Members had known that Defendant would not use adequate data security practices, procedures, and protocols to secure their Private Information, they would have made alternative employment and financing choices that excluded Defendant.

235.    Plaintiff and Class Members have no adequate remedy at law.

236.    Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon it.

237.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) the imminent and substantial risk of actual identity theft; (ii) the loss of the opportunity to control how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual

and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Progressive Leasing fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

238.    Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Progressive Leasing and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Progressive Leasing from its wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

239.    Plaintiff and Class Members may not have an adequate remedy at law against Progressive Leasing, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**COUNT V**
**DECLARATORY/INJUNCTIVE RELIEF**
**(ON BEHALF OF PLAINTIFF AND THE CLASS)**

240.    Plaintiff restates and realleges allegations stated from the preceding paragraphs as if fully set forth herein.

241.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and granting

further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal statutes described in this Complaint.

242.    An actual controversy has arisen in the wake of the Data Breach regarding Defendant's present and prospective common law and other duties to reasonably safeguard Plaintiff and Class Members' PII, and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff and Class Members from future data breaches that compromise their PII. Plaintiff and the Class remain at imminent risk that additional compromises of their PII will occur in the future.

243.    The Court should also issue prospective injunctive relief requiring Defendant to employ adequate security practices consistent with law and industry standards to protect consumers' PII.

244.    Defendant still possesses the PII of Plaintiff and the Class.

245.    Defendant has made no announcement that it has changed its data storage or security practices relating to the storage of Plaintiff's and Class Members' PII.

246.    To Plaintiff's knowledge, Defendant has made no announcement or notification that it has remedied the vulnerabilities and negligent data security practices that led to the Data Breach.

247.    If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another data breach at Progressive Leasing. The risk of another such breach is real, immediate, and substantial.

248.    The hardship to Plaintiff and Class Members if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Among other things, if another data breach occurs at Progressive Leasing, Plaintiff and Class Members will likely continue to be subjected to

a heightened, substantial, imminent risk of fraud, identify theft, and other harms described herein. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

249.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Progressive Leasing, thus eliminating the additional injuries that would result to Plaintiff and Class Members, along with other consumers whose PII would be further compromised.

250.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that Progressive Leasing implement and maintain reasonable security measures, including but not limited to the following:

a.  Engaging third party security auditors/penetration testers, as well as internal security personnel, to conduct testing that includes simulated attacks, penetration tests, and audits on Progressive Leasing systems on a periodic basis, and ordering Progressive Leasing to promptly correct any problems or issues detected by such third-party security auditors;

b.  Engaging third-party security auditors and internal personnel to run automated security monitoring;

c.  Auditing, testing, and training its security personnel regarding any new or modified procedures;

d.  Purging, deleting, and destroying PII not necessary for its provisions of services in a reasonably secure manner;

e.  Conducting regular database scans and security checks; and

f.  Routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class described above, seeks the following relief:

A.  An order certifying this action as a Class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiff is a proper representative of the Class requested herein;

B.  Judgment in favor of Plaintiff and Class Members awarding them appropriate monetary relief, including actual damages, statutory damages, equitable relief, restitution, disgorgement, and statutory costs;

C.  An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

D.  An order instructing Progressive Leasing to purchase or provide funds for lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members;

E.  An order requiring Progressive Leasing to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

F.  A judgment in favor of Plaintiff and Class Members awarding them prejudgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

G.  An award of such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all triable issues.

DATED: November 7, 2023                   Respectfully submitted,


                                          */s/ Rachel Sykes*
                                          Rachel Sykes
                                          PEARSON BUTLER
                                          1802 South Jordan Parkway, Suite 200
                                          South Jordan, UT 84095
                                          Tel: (801) 981-4438
                                          Email: rachel@pearsonbutler.com


                                          Jason S. Rathod (*pro hac vice* to be filed)
                                          Nicholas A. Migliaccio (*pro hac vice* to be filed)
                                          **MIGLIACCIO & RATHOD LLP**
                                          412 H St. NE, Ste. 302,
                                          Washington, D.C. 20002
                                          Tel: (202) 470-3520
                                          Fax: (202) 800-2730
                                          jrathod@classlawdc.com
                                          nmigliaccio@classlawdc.com